**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| JAMES SAMUELS, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 25 C 6517 |
| ) | |
| JEFFREY WEHKING, ) | |
| ) | |
| Respondent. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

On November 20, 2008, after a bench trial in the Circuit Court of Cook County, Illinois, James Samuels was convicted of first-degree murder and concealment of a homicide. The trial judge sentenced Samuels to thirty-four years in prison. Samuels unsuccessfully challenged his conviction and sentence on direct appeal and in state postconviction proceedings.

On June 11, 2025, Samuels filed a *pro se* petition for writ of habeas corpus under 28 U.S.C. § 2254. The state has filed a motion to dismiss the petition. For the reasons below, the Court grants the state's motion and denies Samuels' petition.

### Background

The following facts are based on the state courts' factual findings. Those findings are presumed correct under 28 U.S.C. § 2254(e)(1), and Samuels does not contest their accuracy.

**A.     Trial proceedings**

On June 12, 2005, Samuels strangled his girlfriend, Shanelle Williams, to death

and placed her body in the trunk of his car. Prior to trial, Samuels failed to appear during a status hearing. A public defender representing Samuels at the time informed the court that Samuels had "mental health issues in his background" and that he had heard Samuels "saying things that seemed rather strange." Ex. 1, ¶ 4. The public defender suggested, "That may have been why he was uncooperative, but I don't know. I'm going to try to see him before the next court date. Hopefully we can resolve this." *Id.*

That led the court to ask whether there was "any reason to suspect [Samuels] should have a BCX [behavioral clinical exam]." *Id.* The public defender responded, "Well, in the past—I'll talk to him and let the court know," to which the court replied, "I don't want to be waiting around two years." *Id.* That was apparently the end of the discussion regarding Samuels' fitness to stand trial.

The public defender subsequently filed pretrial motions, which the court denied after a hearing at which Samuels testified. The public defender withdrew a few months later, and Daniel Coyne was appointed to replace him as Samuels' defense counsel. At the hearing on the motion to withdraw, the court asked Samuels if he understood why his counsel was withdrawing, why the public defender's office could not represent him, and that Coyne was being appointed to represent him. Samuels responded yes to each question. On the day of trial, Samuels confirmed to the court that he was pleading not guilty, understood that he had waived his right to a jury and that the court would decide his guilt based on the evidence presented, and had an opportunity to consult with counsel.

At the trial, William Gore—Samuels' friend—testified that Samuels admitted that

he had strangled Williams to death and placed her in the trunk of his car. Chicago Police Detective Richard Sullivan similarly testified that Samuels admitted to killing Williams after he was given *Miranda* warnings. According to Sullivan, Samuels said that Williams told him in his car that she wanted to break up because Samuels could not control his temper. They drove around until Samuels became angry, stopped the car, and blacked out, which Samuels said often happened when he was angry. Samuels told Sullivan that when he came to, he was driving Williams' car toward his car. When he reached his car, Samuels said, he placed Williams' body in the trunk and covered it with a blanket. According to Samuels, he did not remember killing Williams because he had blacked out and only realized what he had done when he was putting her body in the trunk.

The court found Samuels guilty of first-degree murder and concealment of a homicide. The pre-sentence investigation report contained information on Samuels' mental health, indicating that he was "first seen by a mental health professional while in grammar school," had been diagnosed with "being Bipolar and Claustrophobic," and had "attempted suicide 4 times (by overdose on Med.) [sic] Since his incarceration." *Id.* ¶ 10. Samuels also mentioned at sentencing that he was prescribed "Depakote, Zoloft and [Doxepin]" at the time. *Id.*

During the sentencing hearing, the court acknowledged that Samuels had a troubled childhood. On the other hand, the court noted, Samuels had killed Williams out of rage and actively concealed her body. After stating that it was taking aggravating and mitigating factors into consideration, the court sentenced Samuels to a thirty-year prison term on the murder charge and a consecutive four-year term on the concealment

charge, for a total of thirty-four years.

**B.     Direct appeal**

Samuels timely appealed, raising two grounds for appeal:  (1) the trial court erred by not *sua sponte* ordering a fitness hearing even though there was a *bona fide* doubt of Samuels' fitness to stand trial, and (2) his trial counsel was ineffective for failing to request a fitness hearing.  The Illinois appellate court rejected both arguments, holding that the trial court did not have a *bona fide* doubt regarding Samuels' fitness to stand trial and would not have had one even if counsel had requested a fitness hearing.

Though the appellate court recognized that the public defender and pre-sentencing report alluded to Samuels' mental health struggles, the court also noted countervailing evidence of Samuels' rational behavior and demeanor during the hearing on the pre-trial motions, the withdrawal hearing, and the colloquy on the day of the trial. The appellate court concluded that the totality of the record showed that Samuels was able to understand the nature and purpose of the proceedings and participate in his defense.  As a result, the appellate court concluded, the trial court was not required to hold a hearing *sua sponte*, and defense counsel's decision not to request one did not prejudice Samuels.  The appellate court affirmed Samuels' conviction and sentence on September 9, 2011.

What followed next was a series of unsuccessful attempts by Samuels, at this point *pro se*, to continue to pursue his direct appeal.  Samuels first requested and received an extension of time until November 15, 2011 to file a petition for rehearing, but he did not submit his petition until November 24, 2011, apparently believing that he had been given a longer extension.  The Illinois appellate court issued an order on

4

December 9, 2011, stating that it lacked jurisdiction to consider the untimely petition. Samuels then filed a motion to recall the mandate—an attempt to get the Illinois appellate court to reconsider its ruling—on December 13, 2011, but he ultimately received no response.

That same day, Samuels also filed a petition for leave to appeal (PLA) with the Illinois Supreme Court. But by that time, he had missed the deadline under Illinois Supreme Court Rule 315, which states that "[u]nless a timely petition for rehearing is filed in the Appellate Court, a party seeking leave to appeal must file the petition for leave in the Supreme Court within 35 days after the entry of such judgment." Ill. S. Ct. R. 315(b)(1). Since Samuels had not filed a "*timely* petition for rehearing," his opportunity to file a PLA with the Illinois Supreme Court lapsed thirty-five days after the appellate court's September 9 judgment, on October 14, 2011.

The clerk of the Illinois Supreme Court responded on December 30, 2011, informing Samuels that his PLA was untimely as of November 18, 2011[1] and suggesting that he instead file a late PLA—a motion requesting that the Illinois Supreme Court exercise its discretion under Illinois Supreme Court Rule 315 to "extend the time for petitioning for leave to appeal . . . in the most extreme and compelling circumstances." *Id*. Samuels did so seven months later, on July 27, 2012. His late PLA was denied on March 28, 2013.

---

[1] This date is seventy days after the appellate court's judgment. The Court is unsure why Samuels would receive a seventy-day period to file his PLA instead of the thirty-five-day period provided in Rule 315. In any event, the thirty-five-day difference does not affect the outcome here.

C.     **State postconviction proceedings**

Samuels, still *pro se*, filed a state postconviction petition on July 17, 2013, 642 days after his opportunity to file a PLA with the Illinois Supreme Court expired (or 607 days based on the Illinois Supreme Court letter). In addition to the same fitness-for-trial argument raised on direct appeal, Samuels contended that the trial judge improperly considered the fact that he killed Williams out of rage as an aggravating factor and did not adequately consider his mental illness or potential for rehabilitation as mitigating factors. He also claimed that his trial counsel and appellate counsel were ineffective for failing to raise both issues.

As evidentiary support, Samuels provided medical records not presented at trial demonstrating that he "had a long history of mental illness dating back to his childhood[] and . . . experienced blackouts when he got angry, even while he was a minor." Ex. 5, ¶ 13. That evidence included a discharge form diagnosing Samuels with adjustment disorder when he was eleven; a psychological evaluation noting Samuels' anger problems when he was fifteen; and a screening form from the Illinois Department of Health documenting an interview with Samuels when he was seventeen—four and a half years before he killed Williams—in which Samuels stated that he could not see, hear, or control his behavior when he was angry. The screening form also noted that staff members reported that Samuels "appears to dissociate and not be aware of his [behavior] or actions" and "does not respond to verbal / physical intervention when he is in an angry dissociative state." *Id.* ¶ 18.

The trial court summarily dismissed the postconviction petition but only after the state statutory deadline for doing so. On appeal, based on the parties' agreement that

the court erred, the matter was summarily remanded on June 23, 2015. On remand, postconviction counsel was appointed to assist Samuels.

Samuels received a hearing on his postconviction motion in 2018, five years after it was initially filed. Postconviction counsel filed a supplemental postconviction petition, adding an argument that Samuels' trial counsel was ineffective for failing to adequately advise Samuels that a defense to mitigate his first-degree murder to second-degree murder was not viable, allegedly causing Samuels to reject a twenty-year plea bargain.

The state moved to dismiss. The trial court held a hearing on the motion. Though the court determined that the petition was not procedurally barred, noting that the petition was filed before the Illinois Supreme Court clarified the state statutory deadline for filing a state postconviction petition in *People v. Johnson*, 2017 IL 120310, 77 N.E.3d 615, it ultimately rejected Samuels' arguments on the merits. Samuels timely appealed that decision, *pro se*, on the sole basis that his postconviction counsel failed to adequately present his claims. The Illinois appellate court affirmed on August 20, 2024, and the Illinois Supreme Court denied leave to appeal on January 29, 2025.

Samuels filed a *pro se* section 2254 petition in this Court 133 days later, on June 11, 2025.

## Discussion

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Samuels' section 2254 petition is subject to the one-year statute of limitations in 28 U.S.C. § 2244(d), which states that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." *Id.* § 2244(d)(1). That one-year limitations period begins "from the

latest of" four start dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

*Id*.

The statute of limitations is also subject to statutory and equitable tolling, which effectively extend the time to file a petition by pausing the clock. Subsection (d)(2) provides statutory tolling while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." *Id*. § 2244(d)(2). Equitable tolling is appropriate if the petitioner can show "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 645, 649 (2010) (internal quotations omitted).

Samuels filed his section 2254 petition too late. His one-year clock started running from the first start date in subsection (d)(1)(A), when his conviction "became final by the . . . expiration of the time for seeking [direct] review." 28 U.S.C. § 2244(d)(1)(A); *see Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). Under Illinois Supreme Court Rule 315, that was on October 14, 2011—thirty-five days after the Illinois appellate court judgment affirming Samuels' conviction. *See* Ill. S. Ct. R. 315(b)(1). Samuels' section 2254 petition was due one year later, on October 14, 2012.

8

Alternatively, based on the Illinois Supreme Court's December 30, 2011 letter to Samuels, his conviction became final on November 18, 2011, and his time to file his section 2254 petition expired on November 18, 2012. Samuels' unsuccessful attempts to further pursue his direct appeal do not change that calculation. *See Gonzalez*, 565 U.S. at 150–54.

Samuels correctly points out that he had a properly filed state postconviction petition pending from July 17, 2013 to January 29, 2025. That time does not count against the one-year limitations period, but that does not save Samuels' section 2254 petition because his time had run out before July 17, 2013. Statutory tolling does not reset a clock that has already expired. *See De Jesus v. Acevedo*, 567 F.3d 941, 943 (7th Cir. 2009).

Samuels tries to bridge the gap by trying to move back the date on which the clock started. He first asserts that the state created an impediment that caused him to delay filing his section 2254 petition. The impediment, according to Samuels, is the state postconviction statute of limitations, which he argues was unclear until the Illinois Supreme Court's decision in *Johnson*. He cites section 2244(d)(1)(B) and suggests that his one-year limitations period started when the *Johnson* case was decided in 2017. He also asserts that equitable tolling should be applied, presumably to exclude the time before *Johnson* was decided.

This argument falls short of the requirement to obtain a later start date for the one-year limitations period or to pause that period once it has started. As an initial matter, section 2244(d)(1)(B) is limited to state-created impediments that "violat[e] the Constitution or laws of the United States." *See Williams v. Sims*, 390 F.3d 958, 960 (7th

9

Cir. 2004). Samuels does not contend, and the Court cannot see a viable argument, that ambiguity regarding Illinois' postconviction statute of limitations violated the Constitution or federal law.

Section 2244(d)(1)(B) is also inapplicable because lack of clarity concerning a *state* postconviction statute of limitations is not an "impediment to filing a[] [section 2254] application" that "prevented" Samuels from doing so. AEDPA's statute of limitations is an "independent federal rule" that imposes a one-year deadline to file a federal petition, regardless of what the state postconviction statute of limitations is. *See De Jesus*, 567 F.3d at 943.

To be sure, a petitioner might want to take advantage of a state postconviction statute of limitations longer than one year. And because AEDPA requires a petitioner to exhaust their state postconviction remedies before resorting to federal habeas, 28 U.S.C. § 2254(b)(1), a petitioner who takes longer than one year to file their state postconviction petition *and* holds off filing a federal habeas corpus petition in the meantime will be unable to file a federal petition within AEDPA's statute of limitations, absent equitable tolling. But none of that means that a longer, or seemingly longer, state statute of limitations is an "impediment to" or "prevent[s]" a petitioner from filing his federal petition in time. *Cf. Lloyd v. Van Natta*, 296 F.3d 630, 633 (7th Cir. 2002) (noting that an "impediment" under section 2244(d)(1)(B) must actually *prevent* a prisoner from filing his petition). A petitioner could simply choose to file his state postconviction petition within a year, even if the state statute of limitations is longer, to preserve his ability to file a timely federal petition. Or, as many habeas corpus petitioners do (even *pro se* petitioners), a petitioner could file a federal section 2254

petition while the state postconviction petition is still pending, to account for the time that has run off the federal one-year clock between the conclusion of direct appeal proceedings and the filing of the state postconviction petition. *See Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005) ("A prisoner seeking state postconviction relief might . . . fil[e] a 'protective' petition in federal court and ask[] the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted.").

Samuels does not qualify for equitable tolling on this basis for the same reason. Lack of clarity regarding the state postconviction statute of limitations is not an "extraordinary circumstance" that "stood in [Samuels'] way and prevented timely filing" of his federal habeas petition. *See Holland*, 560 U.S. at 649.

Samuels' other contention is that he has presented new evidence proving that he did not have the requisite mental state for first-degree murder, presumably referring to the medical records raised in his state postconviction proceedings. Samuels does not argue that this moves the limitations start date to "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence" under section 2244(d)(1)(D). Nor could he, as he should have known of his own medical records.

Instead, Samuels seeks to bypass the statute of limitations altogether through the "actual innocence" gateway. That gateway, also known as the miscarriage-of-justice exception, lets a habeas petitioner overcome a procedural barrier (including the limitations period) by providing a "convincing showing of actual innocence" that persuades the district court that no factfinder reasonably could have found the petitioner guilty beyond a reasonable doubt. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

11

Samuels has not met that demanding standard.  Under Illinois law, a defendant possesses the requisite mental state for first-degree murder if, "in performing the acts which cause the death," the defendant intended to "kill or do great bodily harm . . . or knows that such acts will cause death."  720 ILCS 5/9-1.  A factfinder reasonably could find beyond a reasonable doubt that Samuels intended to kill or seriously harm Williams, or knew that she would die, when he strangled her.

That is true even in light of Samuels' medical records.  For one, those records showing a history of mental illness and anger-induced black-outs do not establish that he had blacked out when he killed Williams.  Additionally, not all "black-outs" in the colloquial sense absolve a criminal defendant of liability.  Samuels' records reflect that he had trouble controlling his anger and could enter a dissociative state when angry.  But Illinois does not recognize a "diminished capacity" defense; Samuels instead must show that his conduct was involuntary, either because he was criminally insane or because his "bodily movements" were "not controlled by the conscious mind," like during sleep, unconsciousness, or a seizure.  *People v. Grant*, 71 Ill. 2d 551, 558–59, 377 N.E.2d 4, 8 (1978); *see People v. Johnson*, 2018 IL App (1st) 140725, ¶¶ 61–67, 105 N.E.3d 860, 879–80.

Samuels' own state filings recount evidence presented at trial suggesting this was not the case.  According to Samuels' PLA filed before the Illinois Supreme Court, Gore testified that Samuels said that he had choked Wiliams.  That implies that Samuels was conscious and aware of what he was doing when he killed her.  Samuels himself provided a relatively detailed statement to Sullivan in which he recounted the events leading up to the killing and the events after.  Based on this evidence, a

factfinder reasonably could find beyond a reasonable doubt—and despite Samuels' history of mental illness and dissociation—that he acted voluntarily in killing Williams and therefore is guilty of first-degree murder.

Samuels also cannot provide a "convincing showing" that his conviction should have been mitigated to second-degree murder, which Illinois defines as first-degree murder with a mitigating factor of imperfect self-defense or serious provocation. *See* 720 ILCS 5/9-2; *People v. Jeffries*, 164 Ill. 2d 104, 112–14, 646 N.E.2d 587, 591–92. Samuels does not assert that he believed that he was acting in self-defense, so he could qualify for second-degree murder only if the requirements for serious provocation were met. Serious provocation mitigates first-degree murder to second-degree murder when "at the time of the killing [the defendant] is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he or she negligently or accidentally causes the death of the individual killed."[2] 720 ILCS 5/9-2.

At best, Samuels' medical evidence helps him show that he acted under "a sudden and intense passion," but that is not enough. That "sudden and intense passion" must have been triggered by a "serious provocation," and the Illinois Supreme Court has established four categories of provocation that qualify: "(1) substantial physical injury or assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4)

---

[2] The Illinois appellate court has interpreted this language to require two elements: serious provocation *and* negligence or accident. *See People v. Haynes*, 2023 IL App (1st) 220296, ¶ 29, 237 N.E.3d 515, 524. The Illinois Supreme Court has declined to decide whether the statute instead sets up alternative scenarios, requiring accident or negligence only when the defendant kills someone other than the provoker. *People v. Haynes*, 2024 IL 129795, ¶¶ 50–51, 266 N.E.3d 637, 648.

adultery with the offender's spouse." *Haynes*, 2024 IL 129795, ¶ 36, 266 N.E.3d at 645. Williams telling Samuels that she wanted to break up does not fit within any of those categories, nor is it like them. Besides that, Samuels would have to show that he acted proportionally to the provocation, and a factfinder reasonably could find that he did not. *See id.* ¶ 41, 266 N.E.3d at 646.

In sum, Samuels' petition is barred by the statute of limitations, and he has not provided a convincing showing of actual innocence.

### Conclusion

For the reasons stated above, the Court dismisses Samuels' petition [dkt. 1] and declines to issue a certificate of appealability. The Clerk is directed to enter judgment stating: Defendant's petition under 28 U.S.C. § 2254 is denied.

Date: February 12, 2026

_____
MATTHEW F. KENNELLY
United States District Judge